**People of State of Illinois, Appellee, v. Don C. Howell, Defendant-Appellant.**

**Gen. No. 10,961.**

Second District.

December 10, 1956.

Released for publication December 27, 1956.

George H. Morton, of Lombard, for appellant.

William L. Guild, of Wheaton, for appellee; Edwin L. Douglas, of Wheaton, of counsel.

JUSTICE EOVALDI delivered the opinion of the court.

This is a case in which the People filed an information charging the defendant with having committed a lewd and lascivious act in that he exposed himself in public. On his plea of not guilty, he was tried before the court without a jury on this charge, and though all of the evidence was heard, the court never ruled on the guilt or innocence of defendant. Subsequently in the same case the State filed a petition under Chap. 38, Secs. 820.01–825e, Ill. Rev. Stat., 1955, charging the defendant with being a sexually dangerous person, and after motions to dismiss the petition, the defendant was tried before a jury on said petition, and was found by the jury to be a sexually dangerous person, and was sentenced to the Department of Public Welfare of the State of Illinois, and has been by that Department sent to the State Institution at Menard, Illinois.

It is the defendant's contention that once he was tried on the criminal information, the court should have made a finding of either guilty or not guilty and should have entered judgment in conformity with its finding, and that the court had no jurisdiction to try him on the petition charging him with being a sexually dangerous person after having tried him previously on the criminal charge. It is his further contention that, even assuming the court had jurisdiction to try him on

85

the petition, the petition should have been dismissed because the psychiatrists appointed by the court did not agree in their reports preliminary to trial that the defendant was a sexually dangerous person; and that the evidence upon the trial was insufficient to convict the defendant.

It is the People's contention that the court was not compelled to enter a finding and judgment on the criminal information; that it acted properly in entertaining the State's petition under the Sexually Dangerous Persons Act; and that the court had jurisdiction to try the offender on the petition charging him with being a sexually dangerous person, as the defendant had not been tried on the criminal information within the context of the applicable statute. The People further contend that the statute does not require unanimous agreement by the two court appointed psychiatrists; as expert testimony is a question of fact to be ultimately determined by the court or the jury as the case may be. The People further contend that whether or not the evidence presented at the trial on the criminal information was sufficient is a moot question, as the Sexually Dangerous Persons Act merely requires that the defendant be charged with a criminal offense.

The evidence upon the trial was that the defendant, aged 54, was driving his car in the Village of Woodale, in DuPage County, on November 18, 1955, and at approximately 3:15 in the afternoon stopped his car near a school, but did not get out of his car, and from all appearances was fully clothed. At the time he stopped his car there were two eighth-grade girls, Jean Brown and Sharon Stoeck, who were on their way home from school, and he said "Hello" to them. The mother of one of the girls drove up at that time, the girls did not speak to him, and he spoke no further to them. As they went across the street to get into the mother's car, he said "Goodbye."

86

Apparently the girls or the mother became concerned and went to Jean Brown's home and told her father about the occurrence, and he called the police. The police were busy, and Mr. Brown went to a corner of Woodale Road and Irving Park in the Village to tell a corner police officer about what had occurred.

At that time the defendant was in his car outside of the postoffice, and shortly thereafter he drove the car south on Woodale Road, and Mr. Brown and his daughter followed him. The defendant was seen to have again stopped his car on the street in front of the school, and Sharon Stoeck was again at that place, having gone home and returned. He asked Sharon where Bernice Street was, and she said she didn't know. Again on this occasion the defendant did not get out of his car, and was fully clothed. When Sharon told defendant that she didn't know where the street was, Mr. Brown's car came up behind the defendant's car, and she then got into the Brown car, and they pursued the defendant out of town for a mile or two. Mr. Brown testified that he drove perhaps sixty or sixty-five miles an hour in chasing the defendant. During this period of time the crossing guard, Peter Tulp, who was a police officer of the Village of Woodale, had proceeded in a different direction in an effort to apprehend the defendant, and he finally retraced his course and came upon Brown, who had come upon the defendant at the side of the road.

Brown did not get out of his car when he stopped where the defendant was, (nor did his daughter or Sharon Stoeck), and he testified that he did not see any part of the defendant other than his head and shoulders that he could see through the window of the car, and that he did not notice anything unusual about the defendant.

Peter Tulp, the officer, testified that when he got to where the defendant was, which was some distance

87

from town, he got out of his car and walked over to the defendant's car. The defendant had on a shirt, an overcoat and a pair of shoes, and bluejeans which were down around his ankles. He saw the defendant from his thighs down and did not see his private parts. No one other than Peter Tulp got out of his car at the time. The defendant gave his driver's license to the officer. There were other clothes in the car at the time. The defendant pulled up his trousers and drove his car, and the officer and Brown drove their's back to the fire station in Woodale. They then took defendant to jail at Itasca.

The defendant testified in his own behalf and stated that he was employed at the Hawthorne Race Track kitchen, and that he lived there; that he was in Woodale on the day in question looking for a man who was an inspector at the International Harvester Company where the defendant had formerly worked. He stated that his reason for stopping where the two girls were was to inquire the location of a street, and that he had no conversation with them other than that; that the trousers he had on had wax on them because he had been using a wax machine at his work, and that he drove out in the country and was in the process of changing his pants when the officer and Brown arrived; that he had previously changed his shirt when he left Villa Park; that he did not know anyone was following him when he had driven out in the country to change his trousers. He testified further that he was fully clothed when he talked to the girls. On cross examination he admitted that he had had some beer to drink that day. He further testified that his car was a 1948 Chevrolet and that it smoked badly, which might have been the reason, he stated, he did not know anyone was following him. He further testified that when he was arrested, he was tried for speeding in a Justice Court and paid a fine of $53, although he wasn't sure whether

88

it was for speeding, reckless driving, or drunken driving.

The People and the defendant rested their cases, and the court took the case under advisement, and continued same to December 27th. The defendant at the conclusion of the case made a motion for a finding of not guilty, which was denied. Nothing further occurred in the case until January 6, 1956 when the State's Attorney filed the petition charging defendant with being a sexually dangerous person pursuant to the provisions of Chapter 38, Ill. Rev. Stat., 1955, sec. 820 et seq. The court, upon the filing of this petition, appointed Doctors John W. Hanni and Frank M. Lorimer, two psychiatrists, to examine the defendant to determine whether or not he was a sexually dangerous person, and to report their findings, conclusions and recommendations to the court. On January 20, Doctor Lorimer filed his report, which stated that it was his opinion that the defendant did classify as a sexually dangerous person, and he recommended that the defendant be tried under the Sexually Dangerous Persons Act. Dr. Hanni filed his report on February 2 in which he concluded that defendant was an exhibitionist, and that he did not believe that defendant was sexually dangerous.

Following the filing of these reports, the defendant filed a motion on February 27 wherein he moved the court to enter a finding and judgment on the evidence heard in the criminal case. The court entered an order on this motion continuing the hearing on the motion to March 2nd. On February 29, the defendant filed a motion to dismiss the petition charging him with being a sexually dangerous person. As reasons for his said motion, he stated that the criminal charge had been tried; and, because both psychiatrists did not agree in their reports that he was a sexually dangerous person, the court could not try him on the petition. The

court reserved its ruling upon the motion, and a jury was impanelled on the same day and the defendant tried on the State's petition charging him with being a sexually dangerous person, and the jury returned a verdict so finding on March 1st. The cause was continued to March 5th for the purpose of entry of formal order on the verdict. Also, on March 1st the court entered an order that the hearing on the criminal information should be stayed indefinitely. The defendant filed a motion on March 5 for judgment notwithstanding the verdict of the jury and for new trial, which said motions were denied and the order of commitment to the Director of Public Safety was entered.

The evidence before the jury on the State's petition charging the defendant with being a sexually dangerous person was in many respects the same as the evidence heard in the criminal case on December 19th. In addition, however, the State had Doctors Hanni and Lorimer testify as to their examinations of the defendant and as to their opinions as to whether or not he was a sexually dangerous person. It was Dr. Lorimer's conclusion that the defendant was a sexually dangerous person, and it was Dr. Hanni's conclusion that defendant was not a sexually dangerous person. Dr. Hanni further stated that in his opinion the defendant's conduct caused him to be a nuisance, but in terms of doing damage to another person he could not consider him dangerous.

Defendant testified in his behalf and gave a similar account of the occurrence in Woodale on November 18 as he had given in the criminal trial. The jailer of the DuPage County jail, Lawrence Murphy, a deputy sheriff, testified on behalf of the defendant and stated that for the past three or four months the defendant had been in jail and in his custody, and that he had observed him, and that there had been on an average of 125 or 130 prisoners through the jail from week to

week, and that at any one time there were from 20 to 26 men confined there; that in their incarceration they were permitted to roam at large freely among each other during the day, using the bull pen, the open area; that the prisoners were not confined to any individual cell; that during that period of time defendant had been there and had mingled freely with the other prisoners and that there had been no trouble with defendant insofar as his contact with other people in the jail was concerned, and that he had caused no trouble, and that there had been no reports about abnormal sexual conduct on the part of defendant during the time he had been there. On cross-examination the deputy sheriff testified that he had young children in jail in his custody, and that over the period of time of the last few months there had been probably sixty or sixty-five; that they ranged from fourteen to twenty-one, and that he spent eight hours of each twenty-four hour period in the jail; and that it was possible for things of the nature before the court to happen without his knowing it. On re-direct examination he testified that during the hours he was not on duty at the jail, it was the duty of other men to report to him any kind of activity other than the usual; that they had a form to fill out when anyone caused a disturbance and a report was made of it on inspection; that there was no report during the time that defendant was in jail as to anything of that character concerning defendant.

While the Sexually Dangerous Persons Act provides that the proceedings under same shall be civil in nature, we are not unmindful of the fact that a defendant in a criminal proceeding may have his liberties curtailed under the provisions of said Act even though he may not be guilty of the charge made against him in the information or indictment. In this case defendant actually was placed on trial. All evidence had been presented. Possibly the trial court was not convinced

of the sufficiency of the evidence to sustain a conviction.

■■ We have carefully reviewed the evidence in this case. We have noted the differences in the testimony of the two psychiatrists who testified on behalf of the People, one stating that defendant was a sexually dangerous person, the other stating that he was not. Particular attention has been directed to the testimony of the Deputy Sheriff, in whose custody defendant remained for several months prior to the trial. Although the jury is primarily the judge of the facts and the weight and credibility of the evidence, we should not hesitate to reverse a judgment where the evidence on which it is based is of an unsatisfactory character. A reviewing court will set aside a verdict which is against the manifest weight of the evidence. Donelson v. East St. Louis and Suburban Ry. Co., 235 Ill. 625; Fitzgerald v. Chicago & Erie R. R. Co., 144 Ill. App. 100. As was said in Donelson v. East St. Louis Ry. Co., supra, at 628:

"The constitution, which provides that the right of trial by jury as previously enjoyed shall remain inviolate, does not make the jury the final judges of the weight of evidence, and if a verdict is manifestly against the weight of the evidence it is the duty of the trial judge to set it aside and grant a new trial, and a failure to do so is error, for which a judgment must be reversed."

We are of the opinion that the verdict of the jury is against the manifest weight of the evidence. Under this state of the record, it is unnecessary to consider the other matters urged in this appeal. The judgment is, therefore, reversed and the cause remanded with instructions to allow the motion of defendant for a new trial.

Reversed and remanded with instructions.

DOVE, P. J. and CROW, J., concur.